IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FRANCES HAMILTON,

    *Plaintiff,*

    v.

MAYOR & CITY COUNCIL OF
BALTIMORE, ET AL.

    *Defendants.*

Civil Action No.: ELH-10-241

## MEMORANDUM OPINION

Frances Hamilton, plaintiff, a police officer with the Baltimore City Police Department ("BPD") from October 2001 until January 2007, was discharged from employment after a trial board hearing concerning allegations that she had falsified certain paperwork. *See* First Amended Complaint And Demand For Jury Trial ("Am. Compl.," ECF 3) ¶¶ 9, 23. On January 29, 2010, Hamilton filed suit in this Court against the Mayor and City Council of Baltimore ("Baltimore City"); the BPD; former Police Commissioner Leonard Hamm; and Maria Korman and Joann Woodson-Branche, both of whom were legal counsel to the trial board.[1] The suit, under 42 U.S.C. § 1983, alleges that plaintiff's termination from the BPD violated her rights under the First and Fourteenth Amendments of the United States Constitution.[2] *See id.* ¶ 1.

On June 18, 2010, plaintiff voluntarily dismissed her claims against Baltimore City and the BPD. (ECF 4.) The remaining defendants have filed a Motion To Dismiss Or In The

---

[1] When plaintiff was hired in October 2001, Hamm was the Police Commissioner of the BPD. Am. Compl. ¶ 4. Hamilton avers that Hamm was "responsible for the institution and application of the BPD's employment policies, including its internal investigatory and disciplinary processes," and "was the final authority in all disciplinary matters." *Id.* Plaintiff has sued Hamm, Korman, and Woodson-Branche in their official and personal capacities. *Id.* ¶¶ 4-6.

[2] Jurisdiction is proper pursuant to 28 U.S.C. § 1331. Plaintiff filed an amended complaint in June 2010.

Alternative Motion For Summary Judgment ("Motion," ECF 12), which plaintiff opposes. Memorandum Of Law In Support Of Plaintiff's Opposition To Defendant's Motion To Dismiss Or In The Alternative, Motion For Summary Judgment ("Opp'n," ECF 15). After the issues were briefed, the Court held a hearing on July 6, 2011.[3]

### Factual and Procedural Background[4]

As noted, plaintiff joined the BPD in 2001. In September 2005, plaintiff "was transferred to the Accident Investigation Unit ('AIU') of the Traffic Section, Special Operations Division." Am. Compl. ¶ 7.[5] In November 2005, she "lodged a written internal complaint" with the Internal Affairs Division of the BPD, stating that "several police officers within the AIU were submitting falsified overtime slips to be paid for hours that they did not work."[6] *Id.* ¶ 8. In addition, she included "documentation . . . clearly demonstrating that several police officers regularly falsified their overtime sheets, and several supervisors within the AIU were complicit in the approval of the overtime abuse." *Id.*[7]

---

[3] After the hearing, the parties submitted supplemental briefing. *See* Defendants' Brief in Response to the Court's Request for Additional Case Law ("Deft. Supp.," ECF 19); Plaintiff's Supplemental Response to Defendants' Motion to Dismiss or in the Alternative for Summary Judgment ("Pl.'s Supp.," ECF 20).

[4] As discussed, *infra*, the Motion will be considered as one for summary judgment. Therefore, the Court must construe the facts in the light most favorable to plaintiff, as the party opposing the Motion. *See United States v. Diebold*, 369 U.S. 654, 655 (1962). Accordingly, the factual summary is drawn largely from the Amended Complaint, as well as the parties' exhibits.

[5] Defendants aver that plaintiff was transferred on May 19, 2004. *See* Motion Ex. 2. The date is not material to the issues, however.

[6] At oral argument, plaintiff's counsel indicated that he had never seen the internal complaint, but that he had requested it from Ms. Korman in January 2007. According to plaintiff's counsel, Ms. Hamilton submitted that complaint in conjunction with a race/gender discrimination complaint, which he had seen. The race complaint became the subject of a Title VII suit that Ms. Hamilton filed in federal court, in which she was represented by her current counsel. That case, discussed *infra*, was assigned to Judge Quarles.

[7] At oral argument, plaintiff's counsel stated that three officers were complicit in the overtime scheme, one of whom has since died, and that, prior to reporting it, plaintiff

Plaintiff was served with disciplinary charges on November 9, 2005. *Id.* ¶ 9.[8] She claims that her commanding officer, Colonel Scott Williams, called her into his office and served her with "disciplinary charges alleging that at least two of the officers involved in the widespread overtime abuse scheme had accused Plaintiff of falsifying 'Citizen Contact Sheets' in order to pad her monthly statistics." *Id.* According to defendants, plaintiff "was observed transferring information from traffic citations issued in the year 2003 to citizen stop receipts dated in the year 2005." Memorandum of Law in Support of Defendants' Motion to Dismiss or in the Alternative Motion for Summary Judgment ("Mot. Memo.," ECF 12-1) 2.[9]

Hamilton complains that "the Internal Affairs Division 'administratively closed' the overtime abuse investigation without taking any action whatsoever including interviewing the Plaintiff." Am. Compl. ¶ 11. In contrast, asserts plaintiff, the allegations against her "were investigated by a 'command' investigator." *Id.* ¶ 13. During that investigation, "Plaintiff was involuntarily transferred out of the AIU and assigned to the Inner Harbor Patrol." *Id.* ¶ 14.

The Command investigator subsequently "recommended that plaintiff be brought to a BPD departmental trial board with a view towards termination." *Id.* ¶ 17. On or about October 9, 2006, plaintiff was formally notified that "BPD intended to terminate her employment based upon the results of the command investigation." *Id.* ¶ 18. According to plaintiff, the recommendation to terminate her by way of a "'command investigation,' rather than an

---

(...footnote continued)

participated on one occasion. According to plaintiff, "other officers and supervisors within the AIU encouraged [her] to participate in the falsification of overtime sheets and overtime abuse." Am. Compl. ¶ 8.

[8] Defendants assert that plaintiff was served with a Notification of Accused on November 23, 2005, which was dated November 10, 2005. Mot. Memo. 2 n.2. This matter is discussed in more detail, *infra.*

[9] "Citizen Contact Sheets" are notices that police officers "issue . . . to private citizens as an acknowledgment that the citizen has had a particular encounter with an officer." Am. Compl. ¶ 10. According to plaintiff, they are "of little or no importance." *Id.*

investigation conducted by the Internal Affairs Division, contravenes the policies, practices, rules and regulations" of the BPD. *Id.*

On or about December 16, 2006, Hamm attended plaintiff's birthday celebration at a "local bar and lounge in East Baltimore." *Id.* ¶ 19. There, he "approached the Plaintiff and began discussing the pending trial board hearing. During the discussion, Defendant Hamm acknowledged to the Plaintiff that the charges [against her] were minor in nature, and he assured her that she would not be terminated." *Id.* Nevertheless, "Defendant Korman then scheduled a trial board hearing with a view toward terminating the Plaintiff's employment."[10] *Id.* ¶ 20.

In preparation for the trial board hearing, scheduled for January 26, 2007, plaintiff requested discovery and the appearance of certain defense witnesses, pursuant to the Law Enforcement Officers' Bill of Rights ("LEOBOR"), Md. Code (2003), § 3-101 *et seq.* of the Public Safety Article ("P.S."), and BPD rules and regulations. *Id.* ¶ 21. Plaintiff also provided Korman with documentation from plaintiff's doctor, recommending that plaintiff not be required to participate in the trial board hearing, as she was on prescription pain medication. *Id.*[11] According to plaintiff, Korman did not provide complete discovery or insure the appearance of witnesses, and "ignored" the recommendations of plaintiff's doctor. *Id.*

Plaintiff's counsel sought a continuance of the trial board, but Korman refused to consent. *Id.* ¶¶ 22-23. When the trial board proceeding went forward on January 26, 2007, plaintiff did not appear. *Id.* ¶ 23. The hearing board recommended plaintiff's termination. *Id.* On January 30, 2007, Hamm ratified the hearing board's recommendation, and plaintiff's

---

[10] Although the official charge is not included in the record, it is undisputed that it is based on plaintiff's alleged falsification of citizen contact receipts.

[11] In May 2006, plaintiff "sustained a severe shoulder injury while single-handedly pulling a drowning woman from the harbor," and she subsequently filed a worker's compensation claim and underwent medical treatment for that injury. *Id.* ¶¶ 15-16.

termination was effective as of that date.[12]  *Id.*  Plaintiff then filed a "Petition for Judicial Review" in the Circuit Court for Baltimore City.

In April 2007, plaintiff was hired by the Baltimore City School Police ("BCSP"). *Id.* ¶ 25.  However, "approximately two weeks after [plaintiff] was hired, Korman, on her own initiative, forwarded an e-mail to officials at the [BCSP] force," which "contained disparaging remarks about the Plaintiff."[13]  *Id.*  Plaintiff avers that she was terminated from her position at BCSP because of that email.  *Id.*

In October 2007, plaintiff filed suit in federal court against Baltimore City, the BPD, and Hamm (Case No. WDQ-07-2952), alleging employment discrimination and retaliation on the basis of race.  *See* Opp'n Ex. 1.  On April 23, 2008, Judge Quarles dismissed the suit against Baltimore City.  *See Hamilton v. Mayor & City Council of Balt.*, No. WDQ-07-2952, ECF 8, slip op. at 5 (D. Md. Apr. 23, 2008).  Plaintiff and the remaining defendants stipulated to a dismissal of that case, with prejudice, on April 9, 2009.  *Id.* at ECF 22.

As noted, plaintiff also pursued remedies in the Maryland state judicial system.  With respect to plaintiff's "Petition for Judicial Review," the Circuit Court for Baltimore City heard argument on May 27, 2008.  Am. Compl. ¶ 24.  In a written opinion issued on June 3, 2008, the circuit court held that plaintiff's termination was "arbitrary and capricious," and that she had not been afforded the due process guaranteed by law and by the LEOBR.  *Id.* ¶ 28; *see* Opp'n Ex. 3. The circuit court remanded for a new hearing by the trial board.

In the months that followed, "Plaintiff, through her counsel, sought reinstatement to her former position as police officer."  Am. Compl. ¶ 29.  According to plaintiff, "Defendant

---

[12] Although not material, defendants assert that plaintiff was actually terminated on February 2, 2007.  Mot. Memo. 2.

[13] The text of the e-mail has not been presented to the Court.

Woodson-Branche resisted these efforts and flatly failed and refused to facilitate the Plaintiff's reinstatement in defiance of the Circuit Court's ruling." *Id.*

The trial board rehearing was held on October 6, 2009. Again, plaintiff did not appear. *Balt. Police Dep't v. Hamilton*, No. 1794, slip op. at 7 (Md. Ct. Sp. App. May 23, 2011) (unpublished).[14] The trial board again found plaintiff guilty and recommended termination of her employment. *Id.*

On December 30, 2009, plaintiff sought judicial review of the trial board rehearing.[15] *Id.* At a hearing held in August 2010, the Circuit Court for Baltimore City concluded that the BPD had, *inter alia*, violated plaintiff's due process rights. Again, it remanded for a new trial board proceeding. *Id.* at 10. The BPD succeeded in obtaining a stay of that decision, pending appeal. *Id.* On appeal, the Maryland Court of Special Appeals considered whether "the Circuit Court err[ed] by holding that Hamilton was denied procedural protections afforded by the Law Enforcement Officers' Bill of Rights ("LEOBR") and the BPD's Disciplinary Rules?" *Id.* at 11 (citation omitted). In reversing the circuit court, the Maryland appellate court stated that plaintiff "was not entitled to be reinstated to active duty," and it was "not persuaded that [plaintiff] was denied due process and other basic rights during the disciplinary process." *Id.* at 18.

Plaintiff subsequently filed a Petition for Writ of Certiorari in the Maryland Court of Appeals, which is now pending. *See* Deft. Supp. Ex. 1. There, plaintiff avers, *inter alia*, that she

---

[14] Under FED. R. EVID. 201, a court may take judicial notice of adjudicative facts if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Therefore, I shall take judicial notice of the Maryland Court of Special Appeals's unpublished opinion involving matters related to this case.

[15] Plaintiff also sought review of another trial board decision on a separate charge, not relevant here.

- 6 -

"was denied due process rights," and that the "Court of Special Appeals erred in its decision that [she] was not denied her rights under the LEOBR." Deft. Supp. Ex. 1, at 9, 10, 12.[16]

Additional facts will be included in the discussion, as relevant.

DISCUSSION

I. Standard of Review

Defendants have moved to dismiss or, in the alternative, for summary judgment. When deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court considers the complaint, as well as documents attached to it that are "integral to the complaint. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) ("We may consider documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic . . . ." (citation omitted)). FED. R. CIV. P. 12(d) provides that, if "matters outside the pleadings are presented to and not excluded by the court" in connection with a Rule 12(b)(6) motion, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."

The Court is mindful that this case is in the early stage of litigation. Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214,

---

[16] Among other things, plaintiff complains that she should have been placed on active duty or suspended with pay during the pendency of the LEOBR proceedings. Plaintiff's attorney in the Maryland appellate case is not her counsel in this case. However, it appears that counsel for plaintiff in this case has represented plaintiff since January 2007, which included the trial boards, proceedings in the circuit court, and the prior federal case.

244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. FED. R. CIV. P. 56(d); s*ee Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).[17]

Notably, "Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery." *Young v. UPS*, No. DKC-08-2586, 2011 U.S. Dist. LEXIS 14266, at *62 (D. Md. Feb. 14, 2011). "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, No. JFM-09-3110, 2011 U.S. Dist. LEXIS 61044, at *11 (D. Md. June 7, 2011) (alteration in original) (quoting *Young*, 2011 U.S. Dist. LEXIS 14266, at *62). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 953 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006) ("A Rule 56[(d)] motion for additional discovery is properly denied when the additional evidence sought to be discovered would not create a genuine issue of material fact sufficient to defeat summary judgment." (citing *Strag*, 55 F.3d at 954)); *see also Young*, 2011 U.S. Dist. LEXIS 14266, at *63 (plaintiff's Rule 56(d) request "must be denied, as

---

[17] Plaintiff had actual notice that defendants seek summary judgment. As noted, defendants' motion is captioned "Defendants' Motion to Dismiss or in the Alternative Motion for Summary Judgment," and plaintiff's response is entitled "Memorandum of Law in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss or in the Alternative, Motion for Summary Judgment." *See, e.g.*, *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260-61 (4th Cir. 1998) (holding that a district court's conversion of a motion to dismiss into one for summary judgment, under similar circumstances, was not an abuse of discretion).

the additional requested discovery would not create a genuine dispute of fact sufficient to defeat summary judgment").

Here, both sides submitted exhibits in connection with the Motion and the Opposition. In addition, both sides have been involved in ongoing litigation in related cases, in both state and federal court, where discovery was exchanged. Yet, in her post-hearing Supplement, plaintiff, for the first time, belatedly complains that discovery "is sorely needed" in order to resolve what she identifies as lingering evidentiary issues about the overtime abuse scheme *and* the investigation concerning plaintiff's falsification of citizen contact receipts. Pl.'s Supp. 1.[18] However, plaintiff has never submitted a Rule 56(d) affidavit in support of a claim for additional discovery. Moreover, despite plaintiff's claim for needed discovery, the Court finds that plaintiff has failed to demonstrate that the evidence she now wishes to discover will materially affect the outcome of this case. Because plaintiff has not demonstrated that further discovery is needed, the Court will construe the Motion as one for summary judgment.

Under Rule 56(a), summary judgment is properly granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing former FED. R. CIV. P. 56(c)). When this burden is met, the non-moving party then bears the burden of demonstrating that disputes of material fact preclude the entry of judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A

---

[18] Plaintiff also argues that she "intends" to move for leave to file a surreply to defendants' Reply, which was filed February 10, 2011, and for leave to amend her First Amended Complaint. *Id.* at 2. No such filings have been made.

party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586; *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).

As indicated, in resolving a summary judgment motion, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587; *see also Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former FED. R. CIV. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex Corp.*, 477 U.S. at 322-24.

The "judge's function" in reviewing a summary judgment motion is not "to weigh the evidence and determine the truth of the matter," but rather, "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment. *Id.* at 248. In my view, this case does not involve disputes of material fact.

## II. Section 1983

Plaintiff asserts her claims under 42 U.S.C. § 1983. It provides, in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). In analyzing a § 1983 claim,

a court must first identify "the specific constitutional right allegedly infringed." *Albright*, 510 U.S. at 271.

In this case, plaintiff alleges (1) that the defendants retaliated against her for exercising her First Amendment rights, and (2) that defendants' actions deprived her of the liberty interest guaranteed by the Fourteenth Amendment, without due process.

A. First Amendment Retaliation

(1)  The Contentions

In Count I of her Amended Complaint, plaintiff alleges that she was terminated from her employment with the BPD, in retaliation for the internal complaint that she lodged regarding "widespread overtime abuse."  Claiming that the subject of her internal complaint was one of "public concern," plaintiff contends that it constituted "protected" speech under the First Amendment.  Am. Comp. ¶¶ 36, 37.

In their Motion, defendants challenge Count I on the ground that plaintiff's internal complaint about overtime abuse did not amount to protected speech.  They argue that the form, content, and context of plaintiff's speech, which concerned overtime slips that were allegedly falsified by fellow police officers, involved "possible employee misconduct, which is a personnel matter, not a matter of public concern."  Mot. Memo. 6.  Therefore, defendants contend that the complaint constituted "a private disciplinary matter between the employer and several of its employees," which did not implicate the First Amendment.  *See also* Defendants' Reply to Plaintiff's Opposition to Motion to Dismiss or in the Alternative Motion for Summary Judgment ("Reply," ECF 16) 6.  Defendants also maintain that plaintiff "spoke primarily as an employee" and that, based on BPD General Order C-2, she "had an official duty to report the alleged misconduct of her coworkers."  Deft. Supp. 3.

In addition, defendants contend that plaintiff was terminated for "falsifying citizen contact receipts" in September 2005. Mot. Memo. 8; *see* Reply 5. In this regard, they point out that plaintiff did not complain to the BPD's Internal Investigation Division ("IID")[19] about the alleged overtime abuse until November 2005, more than a month after the commencement of the investigation into plaintiff's improper conduct in September 2005. Therefore, defendants insist that "the order of events does not support a causal connection between the plaintiff's termination and her … complaint" to IID. Mot. Memo. 8.

In support of their position, defendants have submitted several exhibits.[20] According to defendants, these exhibits establish the following:

> On September 22, 2005, an AIU co-worker, Officer William Murray, observed the Plaintiff falsifying information on several citizen contact receipts. Specifically, the Plaintiff was observed transferring information from traffic citations issued in the year 2003 to citizen stop receipts dated in the year 2005.
>
> Officer Murray reported his observations to the Plaintiff's supervisors, and on September 22, 2005, said supervisors initiated an internal investigation into the Plaintiff's actions. A month later, on or about early November 2005, the Plaintiff submitted an internal complaint to the BPD's Internal Investigation Division (IID), alleging that several police officers had falsified their overtime slips with the approval of their supervisors. On November 23, 2005, the Plaintiff was served with disciplinary paperwork related to the September 22, 2005 internal investigation into her misconduct. Over a year later, on or about February 2, 2007, the BPD terminated the Plaintiff based upon the charges initiated against her on September 22, 2005.

*Id.* at 2 (citations omitted).

---

[19] The parties refer to the "Internal Affairs Division" and IID interchangeably.

[20] These exhibits include: affidavits from BPD staff members Major Mary Patterson, a personnel officer (Ex. 2), and Officer Deana Ackiss, who investigated the complaint lodged against plaintiff (Ex. 3); a memorandum from Officer Ackiss to Major Paul Sheppard of the "Special Operations Section" (Ex. 3A), reporting Officer Ackiss's findings; two "Internal Incident Report" forms, dated September 22, 2005, from officers William Murray (Ex. 3B) and Leslie Banks (Ex. 3C), reporting the initial allegations against plaintiff; and a "statement of Officer William Murray," in response to Officer Ackiss's investigation (Ex. 4).

Defendants also argue that there is no case law to support an inference of retaliation merely because the investigation of plaintiff was conducted by a Command investigator, rather than an IID investigator. Deft. Supp. 4. Further, defendants contend that any alleged retaliatory acts that occurred *after* plaintiff's termination cannot form the basis of a retaliation claim, as no employment relationship existed between plaintiff and the BPD at that time. Mot. Memo. 7; *see* Reply 5. They assert: "The only timely pled employment action is the Plaintiff's termination, and there is no causal connection between the Plaintiff's termination and her internal complaint to [IID]." Mot. Memo. 7.

In her Opposition, plaintiff counters that she was not subjected to an IID investigation until *after* she complained about the overtime abuse. Opp'n 7. Plaintiff posits: "There is no evidence that an investigation was conducted on September 22, 2005." *Id.* at 4. Rather, she claims that Officer Ackiss, who was responsible for investigating the complaint lodged against plaintiff, did not initiate interviews until December 2005. *Id.* Hamilton also theorizes that "she was retaliated against not only for her reporting the overtime abuse scheme, but also for her refusal to participate in the scheme," Pl.'s Supp. 4,[21] and questions why no action was taken as to her complaint of overtime abuse. Opp'n 7. In addition, plaintiff complains that the BPD did not follow its own rules and regulations, which require IID to investigate matters pertaining to integrity, while "command investigators are reserved for officers who commit minor infractions." *Id.* 4-5. Thus, plaintiff insists that the BPD violated protocol, because she was fired after a Command investigation, *not* an IID investigation. She states: "The fact that the defendants failed to comply with its own policies and procedures is a clear indication that the

---

[21] At oral argument, plaintiff's counsel suggested that plaintiff had been "told" to falsify citizen contact receipts. Whether plaintiff was instructed to falsify citizen contact receipts is of no moment. The merits of that charge, and any applicable defenses, are not before this Court. That matter was the subject of litigation in the Maryland state courts.

'trumped-up' allegations against the plaintiff which led to her subsequent termination are pretextual." *Id*. at 5.

Further, plaintiff contends that her speech was protected, asserting: "The misuse of funds provided by the public is of public concern." *Id.* at 6. She elaborates, *id.* at 5-6:

> It is a matter of sworn police officers committing fraud by receiving monetary compensation for work they did not perform. It is a matter of officers being paid regularly by taxpayers and companies in need of services, for work that they never performed and never planned on performing. This is more than just an internal matter. The public has a right to have waste and/or fraud eradicated from their law enforcement agencies. This is what the Plaintiff attempted to do and she was ultimately fired for it.

At oral argument, plaintiff's counsel elaborated. Acknowledging that General Order C-2 mandated the reporting of misconduct by plaintiff, her attorney argued that plaintiff had dual interests both as a citizen and as an employee, and that her duty as a citizen trumped her duty as an employee. *See also* Pl.'s Supp. 2 ("**Plaintiff's allegations were made in her dual role as a private citizen and a police officer/employee who owed a duty to report misconduct.**" (emphasis in original)).

With regard to defendants' claim that actions taken after plaintiff's termination cannot form the basis of a retaliation claim, plaintiff asserts that such an argument would unfairly allow an employer to "simply fire an employee and continue a pattern of retaliation that is clearly related to their employment, without consequences." Opp'n 7-8. She avers that the e-mail purportedly sent by Korman was a continuation of the retaliation that began when she was terminated for "reporting the misconduct of other officers." *Id.* at 8. Plaintiff also disputes the assertion that her claim is barred by the statute of limitations. In this regard, she notes that her complaint was filed on January 29, 2010, and she was fired on January 30, 2007. *Id.*

Additionally, plaintiff argues that she has sufficiently alleged a causal connection between the speech and the alleged retaliation. *Id.* at 6. She explains that she was investigated "very shortly after she reported the overtime abuse," and "fired thereafter," with "barely" an investigation into the allegations of her internal complaint concerning overtime abuse.[22] *Id.*

Plaintiff also challenges the reliability of many of defendants' exhibits. Specifically, she notes one that is "un-notarized" (Exhibit 3), while others are undated (Exhibits 3A and 3B[23]), unsigned (Exhibits 3B and 3C), or unsworn (Exhibit 4[24]). *Id.* at 3.

In reply, defendants characterize plaintiff's dispute of the facts as "disingenuous." They observe that plaintiff's counsel "has represented the Plaintiff in all of the preceding administrative and federal actions relative to this incident, and thus, was provided with discovery of all documents relevant to her termination," including the exhibits that plaintiff now challenges. Reply 2.

(2) Analysis

The First Amendment to the United States Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." The right of free speech, as guaranteed by the First Amendment, "includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). "Retaliation, though it is not

_____

[22] As noted, plaintiff also complains that defendants did not conduct the investigation of plaintiff according to "required protocol." Opp'n 7.

[23] Exhibit 3B is "not signed with a dated signature." Opp'n 3.

[24] Plaintiff asserts that "this statement was not signed until approximately eight months later, on August 4, 2006." Opp'n 3-4.

expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." *Am. Civil Liberties Union of Md., Inc. v. Wicomico Cnty., Md.*, 999 F.2d 780, 785 (4th Cir. 1993).

A plaintiff seeking to recover on a First Amendment retaliation claim must prove the following: "(1) she engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected her First Amendment rights, and (3) there was a causal relationship between her protected activity and the defendants' conduct." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

To be sure, "government employees do not lose their constitutional rights at work." *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (citing *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004)). But, "the government may impose certain restraints on [their] speech and take action against them that would be unconstitutional if applied to the general public." *Id.*

Several factors guide the analysis of whether plaintiff engaged in activity protected by the First Amendment. As a threshold matter, a court must determine "whether the [public] employee spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006); *see also Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. ____, 131 S. Ct. 2488, No. 09-1476, slip op. at 4-5 (filed March 22, 2011) ("When a public employee sues a government employer under the First Amendment's Speech Clause, the employee must show that he or she spoke as a citizen on a matter of public concern."); *Connick v. Myers*, 461 U.S. 138, 147 (1983) (same). "The public concern test was developed to protect . . . substantial government interests" in the management of its "internal affairs." *Guarnieri*, slip op. at 5.

"If an employee does not speak as a citizen, or does not address a matter of public concern, 'a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.'" *Id.* (quoting *Connick,*, 461 U.S. at 147).[25]  Put another way, if an employee does not speak as a citizen on a matter of public concern, then "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech."  *Garcetti,* 547 U.S. at 418. Whether the speech relates to a matter of public concern turns on "the content, form, and context . . . as revealed by the whole record."  *Connick,* 461 U.S. at 147-48 & n.7.  In *Guarnieri,* the Supreme Court recently said that a petition, made via "an internal grievance procedure," which does "not seek to communicate to the public or to advance a political or social point of view beyond the employment context," does not constitute a matter of public concern. *Guarnieri*, slip. op. at 18.

*Garcetti*, 547 U.S. 410, is instructive as to whether an employee's speech was made as an ordinary citizen or, instead, pursuant to official duties.  There, Richard Ceballos, a deputy district attorney, was alerted to a warrant that was based on inaccuracies in an affidavit.  *Id.* at 413-14. After investigating the affidavit, he prepared a memorandum for his supervisors, explaining his concerns and recommending dismissal of the underlying case.  *Id.* at 414.  Claiming that, as a result of his memorandum, he "was subjected to a series of retaliatory employment actions," Ceballos brought a First Amendment retaliation claim under § 1983.  *Id.* at 415.

In addressing whether Ceballos's memorandum was entitled to First Amendment protection, the Supreme Court observed that a citizen who is a public employee "must accept

---

[25] An employee's speech is not "automatically privileged," even if the employee speaks as a citizen on a matter of public concern.  *Guarnieri,* slip op. at 5.

certain limitations on his or her freedom." *Id.* at 418.  Of import here, it stated, *id.* at 420-21 (citations omitted):

> That Ceballos expressed his views inside his office, rather than publicly, is not dispositive. Employees in some cases may receive First Amendment protection for expressions made at work.  Many citizens do much of their talking inside their respective workplaces, and it would not serve the goal of treating public employees like "any member of the general public," to hold that all speech within the office is automatically exposed to restriction.

> The memo concerned the subject matter of Ceballos' employment, but this, too, is nondispositive. . . .

> The controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy.  That consideration—the fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case—distinguishes Ceballos' case from those in which the First Amendment provides protection against discipline.

The Court explained that, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 422. Nevertheless, the Court went on to "reject . . . the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions." *Id.* at 424.  Noting that "the parties in [*Garcetti* did] not dispute that Ceballos wrote his deposition memo pursuant to his employment duties," the Court acknowledged that it had "no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Id.*  Rather, the Court explained:  "Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties . . . ." *Id.* at 424-25.

The recent case of *Guarnieri*, *supra*, No. 09-1476, is also illuminating.  There, the police chief, Charles Guarnieri, filed a union grievance challenging his termination by the town.  *Id.*, slip op. at 2.  Following arbitration, he was reinstated.  However, the town council then issued various directives pertaining to the performance of the chief's duties.  *Id.*  As a result, Guarnieri filed a second union grievance and a § 1983 action in federal court.  He claimed that his first union grievance was protected by the First Amendment's Petition Clause, and that the directives constituted retaliation for protected activity.  *Id.*, slip op. at 3.  After the council denied an overtime request made by Guarnieri after he filed suit, he amended his § 1983 lawsuit, claiming the denial of overtime constituted retaliation for the filing of the lawsuit.  A jury found in Guarnieri's favor.  *Id.*

Although the suit was based on the Petition Clause, the Supreme Court recognized that it "just as easily could have alleged that his employer retaliated against him for the speech contained within his grievances and lawsuit."  *Id.*, slip op. at 6.  Of relevance here, the Court analyzed the contentions under the same "framework used to govern Speech Clause claims by public employees," *id.*, slip op. at 17, that is, under the "public concern test."  *Id.*, slip op. at 12.  It explained, *id.*, slip op. at 18 (citations omitted):

> As under the Speech Clause, whether an employee's petition relates to a matter of public concern will depend on 'the content, form, and context . . . as revealed by the whole record.'  The forum in which a petition is lodged will be relevant to the determination of whether the petition relates to a matter of public concern.  A petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context.[26]

---

[26]  As explained by the Court, "[e]mployees may file grievances on a variety of employment matters, including working conditions, pay, discipline, promotions, leave, vacations, and terminations."  *Guarnieri*, slip op. at 10.

The Court was mindful that "in one sense the public may always be interested in how government officers are performing their duties." *Id.* But, said the Court, "that will not always suffice to show a matter of public concern." *Id.*

*Andrew v. Clark*, 561 F.3d 261 (4th Cir. 2009), is also noteworthy. In that case, the Fourth Circuit considered *Garcetti* in the context of an internal memorandum that the plaintiff, Andrew, a police officer in the BPD, released to a newspaper, the *Baltimore Sun.* *Id.* at 263. Andrew first wrote the memorandum to the police commissioner regarding police mishandling of a barricade situation. *Id.* at 264. When the police commissioner ignored the memorandum, which he characterized as "'unauthorized,'" Andrew provided it to the newspaper. *Id.* at 264-65. The newspaper published an article regarding the barricade situation, "highlight[ing] the concerns" that Andrew had raised in his memorandum. *Id.* at 265.

After Andrew suffered a series of adverse employment actions, he filed a First Amendment retaliation claim, pursuant to § 1983. *Id.* at 265-66. The district court dismissed the claim, concluding that Andrew had written his memorandum "pursuant to his 'official duties.'" *Andrew v. Clark*, 472 F. Supp. 2d 659, 662 (D. Md. 2007). The court based its conclusion on Andrew's purported concession that "he was 'routinely required to provide an overview, findings and recommendations as to all significant incidents including shootings that occurred within his district.'"[27] *Id.* Having so concluded, the district court did not consider whether the memorandum addressed a matter of public concern. *Id.* at 663.

The Fourth Circuit noted that "Andrew was not under a duty to write the memorandum as part of his official responsibilities." 561 F.3d at 264. It reasoned that he "would not have been

---

[27] At oral argument in the Fourth Circuit, counsel for the appellees (defendants in the district court) conceded that the plaintiff had never made such a concession, and that the statement referred to by the district court had been taken from one of the defendants' memoranda. *Id.* at 266-67.

derelict in his duties as a BPD commander" if he did not write the memorandum; he would not have suffered any employment consequences had he not written the memorandum"; and he "had not previously written similar memoranda after other officer-involved shootings." *Id.* Accordingly, it determined that whether Andrew wrote the memorandum in connection with his official duties was an issue of disputed material fact that could not be decided on a motion to dismiss. *Id.* at 267. Further, it said: "Whether Andrew's delivery of his memorandum to a reporter for the *Baltimore Sun* 'addresses a matter of public concern must be determined by the *content, form, and context* of a given statement, *as revealed by the whole record*.'" *Id.* at 268 (emphasis added) (quoting *Connick*, *supra*, 461 U.S. at 147-48).

*Miller v. Hamm*, No. CCB-10-243, 2011 U.S. Dist. LEXIS 141 (D. Md. 2011), is also instructive. Miller, a member of the BPD, wrote a letter to his supervisors regarding perceived shortcomings in his unit (the "Aviation Unit"). *Id.* at *5. Miller criticized his supervisors for their "'inability . . . to supervise,'" complained that the "training of pilots and observers was inadequate," and referred to an incident in which a helicopter was flown to a school attended by a sergeant's children, garnering media attention. *Id.* at *6-7 (quoting the letter). Miller later filed a First Amendment retaliation claim under § 1983, based on actions that resulted from the letter. *Id.* at *8-11. In analyzing the defendants' motion to dismiss,[28] the district court noted that Miller claimed that he was not under a duty to write the letter and, in fact, had never written any others during the course of his employment with the BPD. Therefore, it concluded that "dismissal on [*Garcetti*] grounds would be inappropriate." *Id.* at *16-17.

---

[28] The defendants moved to dismiss or, in the alternative, for summary judgment. *Miller*, 2011 U.S. Dist. LEXIS 141, at *2. However, the court declined to convert the motion to dismiss into one for summary judgment, noting that there had "not been a sufficient opportunity for discovery." *Id.* at *4 n.3.

The court next considered whether the letter related to a matter of public concern. *Id.* at *17. Concluding that the letter "involves at least some matters of public concern," the court reasoned: "Specifically, it discusses matters of public safety, . . . and it discusses the public fisc, including the misuse of BPD helicopters." *Id.* at *19. Moreover, the court noted that media outlets had reported the story about "misuse of BPD helicopters," indicating that Miller's letter had, in fact, discussed matters of interest to the public. *Id.* at *21.

With these cases in mind, I turn to the issue of whether plaintiff acted under a duty or as a citizen when she reported the alleged overtime abuse.

General Order C-2, Motion Ex. 5 (ECF 12-9), submitted by defendants and unchallenged as to authenticity by plaintiff, sets forth the "Rules and Regulations" for the BPD.[29] Rule 9, entitled "Internal Investigation and Reporting of Misconduct," is of particular relevance. Motion Ex. 5, at 14. Section 2 of that rule states:

> *Members are required to report any acts of misconduct* including, but not limited to, discrimination, harassment, criminal conduct, *or any other misconduct activity detrimental to the operation of the Department*, in accordance with established procedures. (Emphasis added.)

Based on the text of Rule 9, it appears that plaintiff was "required" to "report" the misconduct of her fellow officers, "in accordance with established procedures." To be sure, *Garcetti* has cautioned that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform." *Garcetti*, *supra*, 547 U.S. at 424-25. Nevertheless, the parties acknowledged at oral argument that, by rule, plaintiff had a duty to report misconduct of her fellow officers, in accordance with established police procedures.

*Houskins v. Sheahan*, 549 F.3d 480 (7th Cir. 2008), supports the view that Rule 9 imposed a duty upon plaintiff that she was "actually … expected to perform." In *Houskins*, the

---

[29] The date of publication is noted as July 15, 2003.

plaintiff, Houskins, was a social worker at the Cook County Department of Corrections. *Id.* at 483. In September 2001, she was struck by a corrections officer during an altercation concerning a parking spot. *Id.* at 484. Houskins recounted the incident to her supervisor, and also filed a report with the Internal Affairs Division, consistent with the Department of Corrections' General Orders, which obligated employees "to report incidents of misconduct immediately." *Id.* Ultimately, however, Houskins was suspended because she had used obscene language. *Id.* at 484-85. With respect to Houskins's First Amendment retaliation claim, the Seventh Circuit stated, *id.* at 491 (citations omitted):

> We first address the internal complaint made by Houskins, which we conclude is an obvious form of speech made pursuant to official duties under the *Garcetti* standard; it would require mental gymnastics to see it otherwise. . . . Almost immediately after the incident in the parking lot, Houskins filed the complaint with IAD, fulfilling her responsibility as a CCDOC employee to report incidents of misconduct immediately to her supervisor, pursuant to the General Orders. Houskins was clearly expected to report the incident under the General Orders, and therefore she was speaking as part of her job as an employee of the Sheriff, and not as a citizen.

To be sure, Houskins, a social worker, was not hired to ferret out employee misconduct at her place of employment. Yet, the Seventh Circuit concluded that the rule requiring her to report misconduct was a duty that she was expected to perform. Plaintiff's situation is virtually indistinguishable from that of Houskins.

Moreover, plaintiff has not provided the court with any authority to support her novel claim that, in reporting the alleged overtime abuse, plaintiff wore two hats – one of an employee and one of citizen – and thus she was entitled to the protections afforded to one who acts solely as a citizen. The BPD's General Order C-2 required plaintiff to report misconduct within the chain of command. In doing so, plaintiff clearly was acting pursuant to a duty imposed upon her

as a BPD employee.[30]  It follows that plaintiff's report of overtime abuse was not made in her capacity as a public citizen.

It is also clear that plaintiff's "speech" (i.e., her complaint about overtime abuse) did not cause her termination.  The requirement of causation is "'rigorous' in that the protected expression must have been the 'but for' cause of the adverse employment action alleged." *Ridpath v. Bd. of Governors Marshall Univ.,* 447 F.3d 292, 318 (4th Cir. 2006).  Causation "can be decided on 'summary judgment only in those instances when there are no causal facts in dispute.'"  *Love-Lane v. Martin*, 355 F.3d 766, 776 (4th Cir.) (citation omitted), *cert. denied*, 543 U.S. 813 (2004).

In *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337 (4th Cir. 2000), *cert. denied*, 531 U.S. 1126 (2001), the Fourth Circuit reviewed a grant of summary judgment with respect to a First Amendment retaliation claim.  Goldstein, the plaintiff, was a fire fighter who alleged that he had been suspended and later terminated from employment for writing memoranda to the fire company's executive committee with respect to various public safety and favoritism concerns.  *Id.* at 353.  In connection with the parties' cross-motions for summary judgment, Goldstein "submitted no evidence, even following the completion of extensive discovery, that the substance of his protected speech was a substantial factor behind his suspension."  *Id.* at 356.  Rather, the Fourth Circuit noted that the "testimony" submitted in connection with the motions revealed that the various executive committee members responsible for suspending (and later terminating) Goldstein all "articulated reasons separate and distinct from Goldstein's protected speech."  *Id.* at 357.  For instance, it was uncontested that several committee members were of the view that Goldstein had violated a prior employment agreement,

---

[30] Because the Court has determined that plaintiff's speech was made pursuant to a duty, it need not determine whether the substance of plaintiff's speech involved a matter of public concern.

furnishing a clear justification for sanctions, regardless of his alleged protected speech. *Id.* at 357-58. Additionally, the Court remarked that the fire company had never acted "with the intent of quashing the substance of [Goldstein's] complaints," but had followed up on the problems Goldstein identified and created a process for filing future complaints. *Id.* at 358.

The Court observed that Goldstein's "argument is, at base, that because some of his allegations were true, his suspension must have been substantially caused by the allegations." *Id.* In the Fourth Circuit's view, "[t]he uncontroverted evidence establishe[d] that [the fire company] suspended Goldstein for other conduct." *Id.* In holding that no reasonable jury could conclude that the articulated reasons for Goldstein's suspension were pretextual, the Court reasoned, *id.*:

> Even if true, these allegations do not carry the required burden. What Mr. Goldstein needed to produce was evidence that the protected speech -- the allegations of safety violations – was a substantial factor in his suspension *or* that the articulated justifications for his suspension were a pretext. He has submitted no evidence to either effect.

Here, it is evident that plaintiff was terminated because of her misconduct in September 2005, in which she falsified citizen contact receipts, and not because of her complaint in November 2005, regarding overtime abuse. Like the unsuccessful plaintiff in *Goldstein*, Hamilton relies almost exclusively on her own allegations, and presents no evidence, not even her own affidavit, to counter the submissions put forth by defendants, all of which plainly indicate that plaintiff was terminated because of her own misconduct.[31]

As noted, plaintiff seeks to challenge the reliability of some of the defense exhibits. "It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment." *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993). Rather, "[t]o be admissible, documents must be authenticated[ ] by and attached to an affidavit . . . and the affiant

---

[31] The parties in *Goldstein* enjoyed the opportunity for discovery. But, as discussed, *supra,* plaintiff was involved in a related federal case, and in two trial board proceedings involving the conduct of hers at issue here. Nor has she properly asserted a need for discovery.

must be a person through whom the exhibits could be admitted into evidence." 10A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2722, at 383-84 (1998); *accord Orsi*, 999 F.2d at 92. Pursuant to FED. R. CIV. P. 56(c)(4), an affidavit submitted in conjunction with a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

Defendant's Exhibit 3 is the Affidavit of Officer Ackiss, dated March 9, 2009. Although Exhibit 3 is not notarized, Ackiss signed it "under the penalties of perjury," stating that her Affidavit is "true and accurate to the best of [her] knowledge and belief."[32] Motion Ex. 3. Ackiss also averred, "under the penalties of perjury," that Exhibits 3A, 3B, and 3C are "true and accurate business records kept by [her] in the ordinary course of business," and that they are "true and accurate." *Id.* In addition, she averred that she prepared Exhibit 3A, an internal memorandum summarizing her investigation of the charge against plaintiff, "upon the completion of [her] investigation into [plaintiff's] misconduct . . . and the document accurately reflects [her] findings." *Id.* Ackiss's Affidavit substantially complied with the requirements of 28 U.S.C. § 1746.[33] *See, e.g.*, *Overly v. Keybank Nat'l Ass'n*, No. 1:08-cv-0662-SEB-TAB,

---

[32] Normally, an affidavit made on "knowledge and belief" is insufficient under Rule 56, because affidavits "must be made based on personal knowledge." FED. R. CIV. P. 56(c)(4); *see Copiers Typewriters Calculators, Inc. v. Toshiba Corp.*, 576 F. Supp. 312, 315 (D. Md. 1983).; *see also Robinson v. Tsys Total Debt Mgmt.*, 447 F. Supp. 2d 502, 508 n.5 (D. Md. 2006) (where defendant attacked a pro se plaintiff's affidavit for employing the phrase "knowledge and belief," the court nevertheless interpreted that affidavit as "indicating that her affidavit is based on personal knowledge" and therefore in compliance with Rule 56(c)(4)). Officer Ackiss's Affidavit satisfied Rule 56(c)(4), because she averred that she has "personal knowledge" of the content, based on her role as the investigating officer assigned to Hamilton's case. Motion Ex. 3.

[33] Section 1746 of 28 U.S.C. provides, in part:

Wherever . . . any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than

2010 U.S. Dist. LEXIS 64105, at *12-13 (S.D. Ind. June 23, 2010) (holding that declarations stating, "I affirm under the penalties of perjury that the foregoing is true, and accurate to the best of my knowledge," "substantially comply" with § 1746); *Smith v. Psychiatric Solutions, Inc.*, No. 3:08cv3/MCR/EMT, 2009 U.S. Dist. LEXIS 27609, at *14-15 (N.D. Fla. Mar. 31, 2009) (stating that the language, "true and accurate to the best of my knowledge and belief," complies with § 1746, "[s]o long as the declaration contains the phrase 'under penalty of perjury' and states that the document is true"); *see also Willard v. IRS*, 776 F.2d 100, 102 (4th Cir. 1985) (citing § 1746 for the proposition that unsworn declarations, "made under penalty of perjury, are permitted in lieu of affidavits"); *Spence v. NCI Info. Sys.*, No. L-05-3127, 2009 U.S. Dist. LEXIS 16415, at *10-11 (D. Md. Feb. 27, 2009) (stating that an unsworn declaration must be certified "under the penalty of perjury" and dated in order to be used "in conjunction with a motion for summary judgment").

In my view, Ackiss's Affidavit plainly establishes the admissibility of Exhibits 3A, 3B, and 3C as business records, based on Ackiss's testimony as custodian of these records.[34]

---

(...footnote continued)

> a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:
>
> . . .
>
> (2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).
>
> (Signature)".

[34] FED. R. EVID. 803 governs certain items not excluded by the prohibition on hearsay, despite the declarant's availability as a witness. FED. R. EVID. 803(6) allows for the admissibility of "Records of Regularly Conducted Activity," which it defines as:

Plaintiff's argument, i.e., that the dates on the internal report forms could have been typed at any time, simply does not hold water. Apart from the suggestion of fabrication by plaintiff, she has not presented any evidence to counter the reliability of these exhibits.[35]

"A mere speculation that the [evidence] might not be credible is insufficient to survive summary judgment." *Shah v. Collecto, Inc.*, No. DKC 2004-4059, 2005 U.S. Dist. LEXIS 19938, at *52 (D. Md. Sept. 12, 2005). Indeed, plaintiff's bald assertion that defendants' evidence is fabricated does not create a "*triable issue* unless plaintiff produces competent evidence that contradicts" defendants' exhibits. *Wilson v. Clancy*, 747 F. Supp. 1154, 1158 (D. Md. 1990); *see Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007) ("But there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'") (quoting *Anderson*, *supra*, 477 U.S. at 249-50 (citations omitted)), *cert. denied*, 552 U.S. 1102 (2008). As one court has observed: "Questions of this general sort often arise in cases where the party resisting summary judgment can muster no

---

(...footnote continued)

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

[35] With regard to Exhibit 4, plaintiff is correct in suggesting that it is an inadmissible unsworn statement, and the Court has not relied on it in its disposition.

competent evidence to avoid it, yet wants to get to a jury in the hopes that the jury will disbelieve the evidence that the summary judgment movant has adduced." *Wilson*, 747 F. Supp. at 1158.

To be clear, the burden is on the moving parties to establish their entitlement to summary judgment. But, that burden "may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, *supra*, 477 U.S. at 325. FED. R. CIV. P. 56(c)(1) requires that a party who is "asserting that a fact cannot be or is genuinely disputed" must support her assertion. She may do so in two ways: by "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; or by "(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.*

Based on the documentary evidence, the credibility of which has not been seriously challenged, it is patently clear that the investigation of plaintiff because of her alleged falsification of citizen contact receipts was well under way by the time she lodged her internal complaint concerning overtime abuse. *See* Motion Exs. 3, 3A, 3B, and 3C. Moreover, it is equally clear that plaintiff's falsification of citizen contact receipts is the reason for which she was terminated. *Id.*; *see also* Motion Ex. 2 (personnel officer's sworn affidavit stating that plaintiff was terminated for falsifying citizen contact receipts).

There is no basis to infer impropriety, animus, or causation based on the claim that the BPD did not follow its own protocol in the manner of its investigation of plaintiff. General Order C-8, submitted as Exhibit 1 with plaintiff's Opposition, provides: "The Chief, Internal

Affairs Division shall retain ultimate authority to determine which matters will be investigated by that Division and which will be investigated by Command." Opp'n Ex. 1 ¶ 6. Even if the Court assumes that plaintiff's infraction was as minor as she claims, an investigation by the wrong unit does not give rise to a claim of retaliation. Moreover, in her Affidavit, Ackiss explains that she was assigned to Hamilton's charge because that unit "did not have a command investigations officer." Motion Ex. 3.

In my view, no reasonable jury would find that plaintiff's speech was the "but-for" cause of her termination. Because plaintiff has failed to prove her First Amendment retaliation claim, the Court shall grant summary judgment to the defendants as to Count I.[36]

## B. Liberty Interest Claim

In Count II of her Amended Complaint, plaintiff asserts that defendants' actions deprived her of a liberty interest without due process, as guaranteed by the Fourteenth Amendment to the Constitution. In particular, she claims a liberty interest "to maintain her good name and reputation for future employment endeavors and opportunities." Am. Compl. ¶ 40.

Defendants argue that Ms. Hamilton "has failed to state a claim of due process violation." Mot. Memo 8. They insist that plaintiff "did not suffer a deprivation of a constitutionally protected liberty interest in employment." *Id.* 8-9. Further, they contend that plaintiff failed to "allege any facts that the Defendants publicized statements about her in conjunction with her termination that were critical of her honesty or morality." *Id.* at 9. Noting that the e-mail allegedly sent by Korman, is "the only public statement" identified by plaintiff, defendants observe that it was sent after Ms. Hamilton's termination. Reply 6. Thus, they assert that it does not qualify as a statement made "in conjunction with" plaintiff's termination. *Id.* Moreover,

---

[36] Accordingly, the Court need not address whether the allegations of retaliation that occurred prior to January 30, 2007, were timely pled, or whether the actions after plaintiff's termination constituted retaliation.

they assert that, "[t]o the extent that the Plaintiff relies upon the misconduct charge that was the basis of her termination," it "was not false." Mot. Memo. 9. According to defendants, the circuit court's rulings as to the trial board proceedings are irrelevant to plaintiff's due process claim, Reply 6, nor does plaintiff's Petition for Writ of Certiorari concern plaintiff's "liberty interest under the U.S. Constitution." Deft. Supp. 5.

In response, plaintiff maintains that the e-mail sent by Korman "contain[ed] disparaging remarks." Opp'n 8. She also asserts that "there is no evidence that anyone from the Baltimore City School Police asked for [Korman's] assessment of the Plaintiff." *Id.* Rather, plaintiff contends that Korman sought "to cast some echo of doubt on the Plaintiff as a trustworthy individual." *Id.* As to defendants' contention that the misconduct charge against plaintiff was well founded, plaintiff points to the written opinion issued by the Circuit Court for Baltimore City on June 3, 2008, in which that court "held that the Plaintiff's termination was arbitrary and capricious and that the Plaintiff was not afforded due process." *Id.* In her view, it is "particularly noteworthy" that defendants and the BPD have "utterly failed and refused [t]o comply with the Circuit Court's Order." *Id.* at 8-9. Specifically, plaintiff cites defendants' failure to reinstate her to her former position. Pl.'s Supp. 3.

The Due Process Clause of the Fourteenth Amendment provides, in part: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. In general, in order to succeed on a due process claim, whether substantive or procedural, the plaintiff must show: (1) that she "has a constitutionally protected 'liberty' or 'property' interest"; and (2) that she "has been 'deprived' of that protected interest by some form of 'state action.'" *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 (4th Cir. 1988); *accord Miller v. Hamm*, *supra*, 2011 U.S. Dist. LEXIS 141, at *25.

In essence, plaintiff claims that she was denied a liberty interest in her reputation without adequate procedural safeguards, which invokes a procedural due process claim.[37] The constitutional right at issue here is "the right to procedural due process when governmental action threatens a person's liberty interest in [her] reputation and choice of occupation." *Ridpath*, *supra*, 447 F.3d at 307.

A public employee's liberty interest claim has its genesis in two discrete rights protected by the Fourteenth Amendment: "(1) the liberty 'to engage in any of the common occupations of life,' and (2) the right to due process '[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to [her].'" *Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir.) (alteration in original) (citations omitted), *cert. denied*, 552 U.S. 1076 (2007). In combination, these rights give rise to the "'liberty interest [that] is implicated by public announcement of reasons for an employee's discharge.'" *Id.* at 645-46 (quoting *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990)).

A liberty interest due process claim "prevent[s] a public employer from disseminating false reasons for the employee's discharge without providing the employee notice and [an] opportunity to be heard in order to clear [her] name." *Miller*, 2011 U.S. Dist. LEXIS 141, at *32; *see Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 & n.12 (1972). Thus, it protects a public employee's "'freedom to take advantage of other employment opportunities.'" *Sciolino*, 480 F.3d at 646 (quoting *Roth*, 408 U.S. at 573).

Notably, "[t]he type of communication that gives rise to a protected liberty interest implies 'the existence of serious character defects such as dishonesty or immorality.'" *Ridpath*,

---

[37] By contrast, "[t]he substantive component of the Due Process Clause 'bars certain government actions regardless of the fairness of the procedures used to implement them.'" *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

447 F.3d at 308 (citation omitted). Statements that insinuate dishonesty or immorality are in contrast to statements that simply allege incompetence, which do not implicate liberty interests. *Id.* "[B]y marking [the employee] as one who lost his job because of dishonesty or other job-related moral turpitude," the state has made the employee "all but unemployable" in his chosen occupation. *Lawson v. Sheriff of Tippecanoe Cnty.,* 725 F.2d 1136, 1139 (7th Cir. 1984).

In sum, to establish a liberty interest claim, the plaintiff must prove that the employer's statements: "(1) placed a stigma on [her] reputation; (2) were made public by the employer; (3) were made in conjunction with [her] termination or demotion; and (4) were false." *Sciolino*, 480 F.3d. at 646 (citing *Stone*, 855 F.2d at 172 n.5); *see Miller*, 2011 U.S. Dist. LEXIS 141, at *32.

As noted, the disputed statements must be made public. *See Wooten v. Clifton Forge Sch. Bd.*, 655 F.2d 552, 555 (4th Cir. 1981); *accord Ridpath*, 447 F.3d at 312. In contrast, a "private communication of the reasons for an employee's discharge" does not implicate a liberty interest. *Robertson v. Rogers*, 679 F.2d 1090, 1091-92 (4th Cir. 1982). As to internal charges, reports, and investigations, which are not inherently public, *see Luy v. Balt. Police. Dep't*, 326 F. Supp. 2d 682, 691 (D. Md. 2004), the employee must allege "a likelihood that prospective employers (i.e., employers to whom [she] will apply) or the public at large will inspect [her personnel] file." *Sciolino*, 480 F.3d at 650.[38]

Defamation by a public official, i.e., injury to reputation by itself, may give rise to a civil cause of action, but is not necessarily sufficient to establish a liberty interest due process claim. *Paul v. Davis*, 424 U.S. 693, 703 (1976). Indeed, "no deprivation of a liberty interest occurs

---

[38] The Fourth Circuit has identified two ways in which a plaintiff can meet this burden: (1) the employee may allege that her former employer's practice is to release personnel files to any inquiring employer, or (2) the employee may allege that "although [her] former employer releases personnel files only to certain inquiring employers, . . . [she] intends to apply to at least one of these employers" and that employer is "likely to request the file." *Sciolino*, 480 F.3d at 650.

when, in the course of defaming a person, a public official solely impairs that person's *future* employment opportunities, without subjecting [her] to a *present* injury such as termination of government employment." *Ridpath*, 447 F.3d at 309 n.16. This is what is sometimes referred to as "stigma plus." *Grimes v. Miller*, 448 F. Supp. 2d 664, 673 (D. Md. 2006); *see Ridpath*, 447 F.3d at 309 n.16.

The Fourth Circuit has "required that, in order to deprive an employee of a liberty interest, a public employer's stigmatizing remarks must be 'made in the course of a discharge or significant demotion.'" *Ridpath*, 447 F.3d at 309 (quoting *Stone*, 855 F.2d at 172 n.5); *see Paul*, 424 U.S. at 710 (stating that "the defamation ha[s] to occur in the course of the termination of employment"). Thus, there must be a "concurrent temporal link between the defamation and the dismissal." *Martz v. Incorp. Village of Valley Stream*, 22 F.3d 26, 32 (2d Cir. 1994).

"[A] 'significant demotion' may include the reassignment of an employee to a position outside his field of choice." *Ridpath*, 447 F.3d at 309. In evaluating "the gravity of [a] change in assignment," a court may consider the surrounding circumstances. For example, a reassignment involving threats to the employee's career has a greater likelihood of being "significant." *Jackson v. Clark,* 564 F. Supp. 2d 483, 491 (D. Md. 2008) (emphasis omitted).

Here, the alleged defamation occurred *after* the effective date of plaintiff's termination. Nevertheless, the requisite temporal nexus is satisfied "when defamatory statements are so closely related to discharge from employment that the discharge itself may become stigmatizing in the public eye." *Campanelli v. Bockrath*, 100 F.3d 1476, 1482 (9th Cir. 1996) ("[W]e believe that [the] 'in the course of the termination' requirement does not rule out the use of all post-termination statements.").

*Hyman v. Town of Plymouth, N.C.*, No. 95-2865, 1996 U.S. App. LEXIS 12518 (4th Cir. May 30, 1996), is instructive. In that case, statements made one month after the plaintiff's termination were *not* sufficient to implicate a liberty interest. *Id.* at *4. Similarly, in *Duggan v. Town of Ocean City*, 516 F. Supp. 1081 (D. Md. 1981), a four-month gap between the alleged stigmatizing statements and the termination constituted "simple defamation." *Id.* at 1085; s*ee also Patterson v. City of Utica*, 370 F.3d 322, 335 (2d Cir. 2004) ("[W]e are nonetheless confident that . . ., where some of the statements were made within one week of plaintiff's termination, and were made in direct response to requests for reasons for plaintiff's termination, that the proper nexus exists . . . ."); *Renaud v. Wyo. Dep't of Family Servs.*, 203 F.3d 723, 727 (10th Cir. 2000) ("[P]ublication of defamatory statements need not be strictly contemporaneous with a termination to occur in the course of the termination of employment. That the allegedly defamatory statements occurred several days following the announcement of Plaintiff's termination does not, of itself, defeat his claim."); *Mertik v. Blalock*, 983 F.2d 1353, 1363 (6th Cir. 1993) (statements were made "roughly contemporaneously"); *Hadley v. Cnty. of Du Page*, 715 F.2d 1238, 1246-47 (7th Cir. 1983) (citing *Duggan* and holding that a statement made two years after termination is too extenuated to implicate a liberty interest), *cert. denied*, 465 U.S. 1006 (1984).

Finally, an employee bringing a liberty-interest claim must allege that the employer's statements were false. As the Court said in *Ridpath,* 447 F.3d at 312: "There can be no deprivation of liberty unless the stigmatizing charges at issue are false."

In paragraph 40 of her Amended Complaint, plaintiff alleges the following infringements upon her liberty interest in her reputation:

> Defendants' (1) failure to adequately investigate the overtime abuse scheme reported by the Plaintiff; (2) false assurances concerning Plaintiff's disciplinary

charges; (3) deviations from established policies, customs, practices and procedures; (4) denial of Plaintiff's due process rights to a fair and impartial hearing; (5) causing Plaintiff to be terminated from the Baltimore Police Department and the Baltimore City School Police force; and (6) failure and refusal to reinstate the Plaintiff to her position as police officer after the Circuit Court for Baltimore City reversed her termination . . . .

Construing plaintiff's Amended Complaint as generously as possible, several of plaintiff's allegations miss the mark. For instance, even assuming the truth of defendants' purported "failure to adequately investigate the overtime abuse scheme reported by the Plaintiff," their "deviations from established policies, customs, practices and procedures," and their "failure and refusal to reinstate" plaintiff, these allegations do not reflect negatively on plaintiff's honesty or morality. With regard to the "false assurances concerning Plaintiff's disciplinary charges," plaintiff averred that those statements were made *to the plaintiff*, not to a third party. Am. Compl. ¶ 19. Moreover, the statement did not imply the existence of a serious character defect.

The only allegations that potentially implicate a liberty interest are those relating to the e-mail allegedly sent by Korman to officials at the BCSP. Because the parties did not provide the content of the e-mail for the Court's review, I will assume, *arguendo*, that the e-mail implied the existence of a serious character defect. Nevertheless, it was plainly not a statement made in connection with plaintiff's termination.

As noted, plaintiff was discharged on or about January 30, 2007. The e-mail was purportedly sent sometime in April 2007, at least two months after plaintiff was terminated from her position with the BPD. In my view, an e-mail sent two months after an employee's termination cannot be characterized as temporally related to the termination, so as to be characterized as made "in the course of termination."

Alternatively, even assuming that plaintiff could show a temporal nexus, I am satisfied that she was afforded ample due process for protection of her liberty interest in her reputation.

Constitutional due process requirements "are defined by the Constitution and do not vary from state to state on the happenstance of a particular state's procedural rules." *Gray v. Laws*, 51 F.3d 426, 438 (4th Cir. 1995) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)). "[U]ltimately, 'the constitutional harm is not the defamation itself; rather it is the denial of a hearing at which the dismissed employee has an opportunity to refute the public charge.'" *Harrell v. City of Gastonia*, 392 F. App'x 197, 203 (4th Cir. 2010) (quoting *Sciolino*, *supra*, 480 F.3d at 649). Conversely, constitutional due process is satisfied where a public employee receives "notice of the proposed deprivation and a pre-deprivation opportunity to respond." *Gray*, 51 F.3d at 438 (citing *Cleveland Bd. of Educ.*, 470 U.S. at 546).

At this juncture, it is important to review applicable Maryland law, including the LEOBR. The LEOBR, P.S. § 3-101 *et seq.*, was enacted by the Maryland General Assembly "'to guarantee certain procedural safeguards to law enforcement officers during any investigation or interrogation that could lead to disciplinary action, demotion, or dismissal.'" *Md-Nat'l Capital Park & Planning Comm'n v. Anderson*, 884 A.2d 157, 175-75, 164 Md. App. 540, 572 (2005), *aff'd*, 395 Md. 172 (2006); *see Sewell v. Norris*, 811 A.2d 349, 354, 148 Md. App. 122, 130 (2002), *app. dismissed*, 821 A.2d 369, 374 Md. 81 (2003); *see also Blondell v. Balt. City Police Dep't*, 672 A.2d 639, 645, 341 Md. 680, 691 (1996). P.S. § 3-107 provides that a "law enforcement agency *shall* give notice . . . of the right to a hearing by a hearing board" to a law enforcement officer who has been recommended for "demotion, dismissal, transfer, loss of pay, reassignment, or similar action that is considered punitive." P.S. § 3-107(a)-(b) (emphasis added). Under P.S. § 3-101(d), a hearing board is defined as "a board that is authorized by the chief to hold a hearing on a complaint against a law enforcement officer."[39] Moreover, the

---

[39] The hearing board must be composed of at least three members, including one member of the same rank as the accused officer. *See* P.S. § 3-107(c). General Order C-8, submitted with

statute provides that "[t]he hearing board shall give the law enforcement agency and the law enforcement officer ample opportunity to present evidence and argument about the issues involved," and that "[e]ach party has the right to cross-examine witnesses who testify and . . . submit rebuttal evidence." *Id.* § 3-107(e)(2), (4). The police officer is also entitled to judicial review of the hearing board's procedure. *Id.* § 3-109.

As indicated, Hamilton had two trial board hearings on the charge that she falsified citizen contact receipts, and she also obtained judicial review in the Circuit Court for Baltimore City as to both of those hearings. With respect to the first trial board proceeding in January 2007, the circuit court concluded that plaintiff was denied due process. Plaintiff has submitted as an exhibit the Opinion and Order of June 3, 2008, issued by the Circuit Court for Baltimore City, in its judicial review of the first trial board proceeding. *See Hamilton v. Balt. Police Dep't*, No. 24-C-07-001424 (Md. Cir. Ct. June 3, 2008), *attached as* Opp'n Ex. 3. The circuit court's decision led to a second trial board hearing on October 6, 2009. That proceeding resulted in the second petition for judicial review filed by plaintiff in the Circuit Court for Baltimore City. Again, that court found that plaintiff was denied due process. Thereafter, the BPD noted an appeal to the Maryland Court of Special Appeals.

As noted in the factual summary, the Maryland appellate court issued its opinion on May 23, 2011. It considered whether the circuit court "err[ed] by holding that Hamilton was denied procedural protections afforded by" LEOBR, P.S. § 3-101 *et seq.*, "and the BPD's Disciplinary Rules." *Balt. Police Dep't v. Hamilton*, *supra*, No. 1794, slip op. at 11. Notably, the Maryland Court of Special Appeals was "not persuaded that [Hamilton] was denied due process and other basic rights during the disciplinary process." *Id.* at 18. In particular, the Maryland state

(...footnote continued)

plaintiff's Opposition, provides that BPD trial board members will be selected "from a trained pool by a random computer program." Opp'n Ex. 1 ¶ 15.

intermediate appellate court observed that plaintiff had *two* trial board hearings on the falsification charges, *neither* of which she attended, although she was represented by counsel the entire time. *Id.* at 7, 17-18. The court reasoned, *id.* at 19:

> [C]orrespondence between counsel for the parties following the court's June 3, 2008 order indicates that [Hamilton] had ample opportunity to participate in the scheduling of the trial boards and the exercise of her rights. . . . [The BPD's] counsel's subsequent letters invited [Hamilton's] participation in the process, including contributing to the make up of the trial boards. Thus, any failure to participate in the scheduling of the trial boards or the exercise of her rights was attributable, at least in part, to [Hamilton's] inaction, not [the BPD's] course of action.

To be sure, this Court's determination as to whether Hamilton was afforded due process hinges on Constitutional law, not state law.[40] Unlike the case pending in the Maryland state system, the issue here is not whether plaintiff's LEOBR rights were violated. Nevertheless, "'the existence of state remedies *is* relevant' for a § 1983 action based on procedural due process," because "'[t]he constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process.'" *Mora v. City of Gaithersburg*, 519 F.3d 216, 230 (4th Cir. 2008) (alteration in original) (quoting *Zinermon v. Burch*, 494 U.S. 113, 125-26 (1990)). A court tasked with determining whether a constitutional violation has occurred must "ask what process the State provided, and whether it was constitutionally adequate. This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law." *Zinermon*, 494 U.S. at 126.

---

[40] Notably, Article 24 of the Maryland Declaration of Rights, which guarantees due process, is interpreted *in pari materia* with the Due Process Clause of the Fourteenth Amendment. *See Koshko v. Haining*, 398 Md. 404, 444 n.22, 921 A.2d 171, 194 n.22 (2007); *Pickett v. Sears, Roebuck & Co.*, 365 Md. 67, 77, 775 A.2d 1218, 1224 (2001); *see also Acorn Land, LLC v. Balt. Cnty.*, 402 Fed. App'x 809, 816 n.10 (4th Cir. 2010). Article 24 states: "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

Without question, plaintiff had notice and an opportunity to be heard as to the underlying charges of her misconduct in September 2005. She had two separate trial board hearings on the charges that led to her termination. She twice sought and obtained judicial review in the Circuit Court for Baltimore City. Thereafter, the Maryland Court of Special Appeals concluded that plaintiff was not denied the due process afforded to her under the LEOBR and the BPD's Disciplinary Rules. It is clear, then, that plaintiff *was* afforded sufficient constitutional due process throughout the disciplinary process. *See Richardson v. Orangeburg Sch. Dist. No. 1*, No. 94-2092, 1995 U.S. App. LEXIS 9960, at *11 (4th Cir. May 3, 1995) ("We have previously held that sufficient process was afforded for protection of a liberty interest when a plaintiff was 'accorded notice of two hearings conducted specifically for the stated purpose of allowing him to attempt to refute the charges against him . . . . before the officials considering them,' and plaintiff 'was allowed on both occasions to testify directly in refutation and to present corroborating witnesses.'" (alteration in original) (quoting *Boston v. Webb*, 783 F.2d 1163, 1166 (4th Cir. 1986)) (internal quotation marks omitted)); *see also Richards v. Mayor & City Council of Balt.*, No. JKB-10-2639, 2011 U.S. Dist. LEXIS 11102, at *4, *13 (D. Md. Feb. 4, 2011) ("In addition to [a BPD trial board hearing], Plaintiff also received judicial review in state court. This is all the process to which Plaintiff is entitled under the Constitution. While Plaintiff contends that that process was defective . . . that claim, whatever its merits, has been litigated in the Circuit Court and is now barred from further review." (citation omitted)); *Jackson v. Clark*, 564 F. Supp. 2d 483, 487, (D. Md. 2008) ("[Then-BPD Commissioner] Clark denied Plaintiff's request for a due process hearing, i.e., a *trial board* . . . ." (emphasis added)).

Because plaintiff has failed to demonstrate that the defendants deprived her of a liberty interest protected by the Fourteenth Amendment, the Court shall grant summary judgment in favor of defendants as to Count II.[41]

A separate Order consistent with this Opinion shall follow.

Date:  August 3, 2011

/s/_____
Ellen Lipton Hollander
United States District Judge

---

[41] Because the Court will grant defendants summary judgment on both Counts, the Court need not address defendants' argument that the plaintiff has not adequately supported her official-capacity claims.